Filed 9/29/21  P. v. Jones CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Placer)

----

| | |
|---|---|
| THE PEOPLE, | C087689 |
| Plaintiff and Respondent, | (Super. Ct. No. 62158924) |
| v. | |
| LLOYD DYLAN JONES, | |
| Defendant and Appellant. | |

During a dispute with his insurance company over unpaid claims defendant Lloyd Dylan Jones engaged in hostile phone calls with and sent hostile e-mails to company employees.  After the insurer, Liberty Mutual, obtained a temporary restraining order against him, defendant was arrested after sending another hostile e-mail to a Liberty Mutual employee.  A protective sweep of his truck following the arrest and subsequent

1

execution of search warrants on his truck and residence found numerous illegal firearms and ammunition.

Following a jury trial, defendant was convicted of four counts of criminal threats (Pen. Code, § 422—counts two to five),[1] one count of attempted criminal threats as a lesser included offense of criminal threats (§ 664/422—count one) four counts of stalking (§ 646.9, subd. (a)—counts six to nine), two counts of possession of a loaded firearm in a vehicle while prohibited from carrying firearms (§ 25850, subd. (c)(4)—counts ten & eleven), two counts of carrying a concealed firearm in a vehicle while prohibited from possessing a firearm (§ 25400, subd. (c)(4)—counts twelve & thirteen), three counts of disobeying a protective order, a misdemeanor (§ 273.6—counts fourteen, fifteen, & thirty-seven), 14 counts of unlawful firearm activity in violation of a restraining order, a misdemeanor (§ 29825, subd. (b)—counts sixteen to twenty-six, thirty-three to thirty-five), two counts of unlawful possession of ammunition (§ 30305—counts twenty-seven & thirty-six), possession of burglary tools, a misdemeanor (§ 466—count twenty-eight), refusal to provide a DNA sample, a misdemeanor (§ 298.1—count twenty-nine), and three counts of possession of an assault weapon (§ 30605—counts thirty to thirty-two). The trial court sentenced defendant to a 10-year state prison term.

Defendant contends (1) the trial court should have granted his suppression motion, (2) the court erred in failing to give a unanimity instruction on the criminal threats counts, (3) failure to instruct on the reasonable person element for attempted criminal threats was prejudicial error, (4) the criminal threats convictions violated his First Amendment rights and were not supported by substantial evidence, (5) one of the stalking counts must be stricken as it was duplicative of another count and based on a penalty provision, (6) there was insufficient evidence to support the stalking convictions, (7) evidence of his

---

[1] Undesignated statutory references are to the Penal Code.

2

Facebook postings was improperly admitted, (8) instructional error on two of the firearm counts resulted in a directed verdict supported by insufficient evidence, (9) failing to instruct on a defense to violations of the assault weapons charges was prejudicial error resulting in an ex post facto conviction, (10) there was insufficient evidence to support one of the assault weapon convictions, (11) there was insufficient evidence to support three of the unlawful firearm activity in violation of a restraining order convictions, (12) there was insufficient evidence to support one of the unlawful possession of ammunition counts, (13) two of the disobeying a court order convictions do not apply to the charged conduct and duplicate the possession of ammunition counts, (14) there was insufficient evidence to support the possession of burglary tools conviction, and (15) the trial court should have stayed sentence pursuant to section 654 on the criminal threats (counts two to five), attempted criminal threats (count one), and carrying a concealed firearm (counts twelve & thirteen).

The warrantless initial search of defendant's truck was supported by probable cause and legal under the automobile exception; evidence taken from this search did not taint the warrant. A unanimity instruction was not necessary, but the instruction on attempted criminal threats was reversible error. There is insufficient evidence to support the convictions for carrying a loaded firearm in a vehicle; the remaining insufficient evidence claims are without merit. Since sufficient evidence supports the stalking and criminal threats convictions and defendant raises no plausible First Amendment defense, the convictions do not violate his First Amendment rights. One of the stalking counts and two of the counts of section 273.6 must be vacated as unauthorized and duplicative of other counts. Finding nine counts must be stayed under section 654 and defendant's remaining claims are without merit, we shall reverse count one (attempted criminal threats) and counts ten and eleven (possession of a loaded firearm in a vehicle), vacate the convictions in counts seven (stalking), fifteen (disobeying a protective order), and thirty-seven (disobeying a protective order), and stay sentence on counts two through five

3

(criminal threats), sixteen, seventeen, and thirty-three through thirty-five (unlawful firearm activity in violation of a restraining order), and otherwise affirm.

FACTUAL AND PROCEDURAL BACKGROUND

*Prosecution Case*

A. *Events Before the Dispute*

In 2013, defendant filed a claim with Liberty Mutual regarding items stolen from his U-Haul truck. Amber C. was the claim adjuster and Liberty Mutual paid $38,000 on the claim. In November 2017, defendant asked Amber if he could add items to his claim. He was paid on the additional claims after providing receipts.

Defendant submitted a new claim based on additional receipts in January or February 2018. Concerned about this claim's validity, Amber investigated and determined the receipts were fraudulent, so the new claim was not paid; Amber contacted her manager Deborah T. and referred the claim to the special investigations unit.

Defendant's claim was assigned to Stephen T. on Friday, February 23, 2018.[2] Defendant called Deborah that same day. Deborah told defendant she would talk to Amber and get back to him on Monday.

B. *The Dispute*

Deborah called defendant the following Monday and told him an investigator had been assigned to the claim. An agitated and upset defendant yelled and cursed, and said he was going to the Rocklin office because he wanted his money. He also warned Deborah, "I will show you that I have guns." She tried to give defendant the investigator's contact information, but defendant kept cursing. Deborah disconnected the call after defendant refused her three requests to stop. She then contacted the Rocklin claims office, corporate security, and the Rocklin police.

---

[2] All relevant acts from defendant's 2018 claim to his arrest took place in 2018. Subsequent date references are to events in 2018 unless otherwise noted.

### 1. *February 26 E-mail*[3]

Stephen had a phone conversation with defendant later that day.  At 5:30 p.m., he sent an e-mail to Deborah that stated in part:

"Trust me, when I say I dispise thieves! when I say if I had caught and had evidence who the thieves were I woulda executed them in front of their kids!!!  If not mistaken in the examining under oath that statement was made, so that's taking an oath too do what?  I believe it was an inside job from uhaul I'm sure but what target all their employed??  Unrealistic.  Texas you can protect property with deadly force!!  I'm moving there, I would get the high five, and honestly my conscious would be clear, sleep just fine.  California I'd deal with the consequences no hesitating if I knew beyond a reasonable doubt who took my property.  The only thing that keeps me grounded was attleast some was insured.  I had family heirlooms, items that are irreplaceable!  I had well over a$100,000.00 stolen, it was a packed uhaul!!!! and now I've recovered a small percentage from Liberty.  I expect a check to be ready for pick up or overnighted do not snail mail and overnight me a letter from your team, disrespect me again?! without a check in it.  Management may be a higher power in your world but at this point they are just another thief that are playing with someone who don't play games on any level."  This e-mail made Deborah fear for herself and her associates as she thought defendant would show up at the Rocklin office.

### 2. *February 27 E-mail*

The next day, February 27, defendant sent an e-mail to Amber and Deborah, which read:

"Item 24, you have had plenty of time too review and in fact cashed me out way short of actual replacement value.  Now your assigning this to an investigator for the

---

[3]     Grammatical and spelling errors in defendant's e-mails are shown as written in the originals.

second time. O.k. I'm personally going to address this on the personal level. Have the law enforcement contact me? hahaha, look I'm collecting what's mine im not asking permission. What I did state is you want me to bring evidence of replacement? ok that's done. provide me proud it's required to collect my policy.

"The bottom line is your making me very uncomfortable and that needs to be repaid directly to you. Again, I'll provide your team over a million dollar off deposits, this will be the last thig I provide, I expect item 245 to be cashed out tmmrw. As stated the gun mill has a deadline of this Friday. I hold you both accountable to meet that time. The ac, item 24. that's been due. Tomorrow I'm collecting that. Debra you ask how is your decisions impacting my son of no concern? You think long about that! This is personal. I told you not to play any more games with me! I'm not going to be broken or discouraged as your last attempt. It is your problem, Ambers, and liberty mutual. Trust I'm not intimidated by you contacting law enforcement. Those receipts directly linked too my bank! Get the vendors on the phone. What else is there to verify!!!! National vendor a3rd party is not insulating you from this."

This e-mail also caused Deborah to fear for her safety.

### 3. *February 28 E-mail*

On February 28, defendant sent a lengthy e-mail to Stephen, Deborah, and Amber. The e-mail began as follows:

"I'm completely obsessed with the handling of this claim. Every minute I'm completely engaged with this. Maybe the way Deborah ran her big mouth but this, I really have no self discipline on. I can't get over Amber and Deboah!! It's not your problem Deborah! That's highly disputable. I feel obligated to prove that you wrong regardless of your opinion.

"The check needs to be ready regarding item 24. You paid a fraction where the fuck is the rest? This is absurd and has triggered a response that needs to be handled face to face under my terms if you delay this one more hour! can be in office, parking lot, or

6

neutral ground, you pick. I'm sorry. 11:30 am? Stephen, nothin personal, all business. No long winded words please. I just need to know where's my check at. I'll be eagerly waiting at 1130hrs PST."

In the next few paragraphs, defendant addresses the necessary proof for the claim, reiterates his request to be paid on items, and asserts Liberty Mutual is mistreating him. He then states:

"Liberty Mutual, and named agents are not in reason and will be met with the same fury. I'm now pushed into a corner. I'm warming up for a fight, battle, and unneeded war with you over what's right?!

"I'm not in reason? Capture this, I will not be pushed around again that's crazy talk. Deborah should never have stated that to me! How the fuck several thousand dollars of my money being held up by her control? that's your mfkn problem. Amber hiding behind management? It's her and Amber's problem that I'm highly uncomfortable with their games. That's your objective?

"Checks and balances, I need my check for items at specified deadlines. I'm not asking permission to go into your workspace, corporate security please?! lol. I know all these buildings!!! Give two fucks about security, or the police! I've done nothing wrong but Deborah ever talks to me like that again it will be brought to her in person. I've been professional but mutual respect not there. I'd love to see if your that assertive in person. Statement. The only objective is to get the facts as efficiently as possible to your team. I've done hundreds of meetings and it's highly more productive face to face. Plus unlikely you would talk the way you did. I've done this already with your team. Don't waste my time with emails and phone calls where the fuck is my money?"

After reiterating his request to be shown the claims process, defendant states:

"I fully am prepared to collect what's rightfully owed to me whatever level this needs to go to. Play with someone else. Your not welcome on my property, or controlled

property. This game ran into dead end, once that old misery ran her mouth the gloves came off.dead wrong to play with me again!!!!"

Defendant follows this with more demands to investigate and pay his claim before continuing:

"That money is owed to me, it is a matter of life and death. It's money that is rightfully mine and I paid out. It's money I need to live, understand? Oh how's that your problem!!! I'll explain that at your desk. Deborah and Amber have disrespected with there lack of integrity! They are the ones who are playing with me. Again, that Deborah? Amber? Liberty Mutual. Call the cops! whatever,, it's not a threat."

After asserting the importance of his commitments, defendant concludes:

"I didn't threaten that day. I asked simply a real question about verifying. I'll bring to her desk, that's the way it will go down if needed. Efficiency. Hiding behind the phone? You have me mistaken. You requested proof? It's my livelihood your fuckin with and I'm sorry, I don't care about professionalism. I only care about my money. That's it. No long winded stories, it is personal. I absolutely hate insurance adjusters now. Think your worse than rats or cockroaches, straight up no respect. After I get what's owed then it will be water under the bridge but IT IS your problem Deborah [T.], Amber [C.] do what's right, but don't play with me. Zero tolerance. Read the notes from deposition dont have me repeat my words and my time is irreplaceable."

This and the prior e-mails made Deborah concerned for her and her fellow employees.

Defendant's e-mails caused Amber to be in constant fear for her life, as she thought defendant was coming for her. Amber was scared by defendant's stating he was taking it personally, he was coming to go find her, that he was going to see her on his terms, and that he did not care about corporate security or the police. She feared defendant might find out where she lived and seriously harm or kill her or her family. She installed an internal security system at her house as a result.

8

After receiving the e-mails, Amber decided to look for defendant on Facebook because she was scared "and needed to know what [she] was up against." Defendant's Facebook page had several photographs of him with guns, including one picture that stated Liberty Mutual and its adjusters were worse than mosquitos. In a comment on another post, defendant wrote, "something to the effect of, 'I'm going to put some work on some scandalous folks that's going to make Channel 13 news.' " Defendant also posted about a school shooting in Florida where 17 people were killed. Seeing defendant's Facebook page made Amber more concerned for her safety and "very afraid."

Amber told Deborah about defendant's Facebook page. Deborah saw pictures of guns, including the photo referring to insurance adjusters on defendant's Facebook page. The caption on the photo said to "[s]tay away from Liberty Mutual they will take your money but make you fight your policy coverages regardless of your health."

While Deborah lived and worked remotely from another state, defendant's threat to go to the office concerned her, particularly in light of their prior interactions and his Facebook posts. Defendant's e-mails said he would "take this to [her] personally," causing Deborah to fear defendant may travel to where she lived to harm or kill her or a member of her family. Deborah thought defendant had the means to reach her as he claimed in the e-mails to have made hundreds of thousands of dollars. She often thought about this situation, making her fear for her safety every day. Deborah removed her phone number and picture from her Facebook profile as a result.

Stephen received defendant's file and examined his Facebook page as part of his investigation of the claim. Seeing several pictures of defendant holding firearms caused alarms to go off for Stephen. These photos and the e-mails caused him to fear for his and his family's safety. As a result, Stephen removed his phone number and address from an internet listing, and he also checked out his home security system.

Stephen had been advised by corporate security not to meet defendant in person, so he told defendant not to go to Liberty Mutual's Rocklin office. Defendant replied that he was going to get paid and wanted to meet in person no matter how often Stephen said this would not happen.

Stephen told defendant his claim would be denied as fraudulent in early March. He told defendant he should send any documentation that could change this to Stephen for immediate review.

4. *March 2 E-mail*

Defendant replied with a lengthy e-mail to Stephen on March 2, which began:

"I talked to Stephen today on the phone after the Rocklin Pd called. Lol. Again. I'll just go to a different jurisdiction. I'm not asking permission from anyone.

"Since you lied about the Florida shooting and social media!! Your worse than any snake attleast a snake has a purpose beyond fuckn people!!!! YEA I posted about some coward police!!! Statements were fabricated I don't give a fuck about the trespassing I'll be out in what 24 hours max!!! probably 6 hours….Which I knew instantly that was a premature statement from the media regarding that coward statement!! half the people i know are private military contractors, police, or contractors serving over seas. Hopefully Liberty Mutual and any case doesn't end up on the media but not with no fuckn weapons you scared little punks!!! Deborah made those gloves come off with her mouth. Amber lied! maybe dont fuck people for a living then you wouldn't have that thought. But no other solution than me or escalation of whatever level. Play games with someone who plays. I never play. My own team dont play with me.

"First, which is absolutely disgraceful and heart sickening YOU even would use a lie and current political environment to attempt to get the law to stop ME?! I never threatened you. I want this to be handled when the fuck your team said!!! Not one more delay. We're done with that bs. I will have all media outlets notified and will make sure

they won't waste their time.  Trust there will absolute be no weapons but a large duffel bag, of receipts.  I still am planning on going too your office if I'm not cashed out for items, I've again been pushed and that will not happen any longer.  Still I have not been shown that receipts are mandatory POST claim we are not building a house damaged from fire.  For theft again prove to me, and three reimbursed for full policy limits.

"Prior to any arrival I will do my best too have their media trucks in the parking lot when I arrive. if not I'll have a multiple camera angles independently and have body camera on me.  There will be no weapons, get that out of your fuckn heads!!!!  I'm not going to physically hurt anybody but would only defend my self or family the objective while I'm being escorted off in handcuffs will be too speed up your fuckin games, business will be impacted, just like my life is.

"Insurance adjusters are worse than any creature living in the caves at Afghanistan.  Your worse than that punk ass coward shooting them kids, you use social media postings to lie?  I'm high opposition to that tactic and your a coward.  Your fuckin crazy for even implying that.  I have been on all your social media as well.  Straight up. Before any contact made by the police.  That we will address in a future lawsuit."

The e-mail concluded with several paragraphs in which he vows to continue the matter until paid, threatens to take the matter public, to use his expertise in marketing, and demand payment.

     5. *March 5 E-mail*

Amber and Deborah received the following e-mail from defendant on March 5:

"This is something regardless of your corporate, or security or police say in the matter your the thieves.  How this is going to go down with you. which is a joke, call the police and lie. your filthy.  Your game.  You have no idea what your doing.  I will personally address you both, I'm patient for settling scores lol. look at the multiple lawsuits I have won with a fraction of evidence.  In three weeks I'll spend that in one night or give away whatever proceeds too sone charity.

11

"Besides the theft by some random thieves no one's stupid enough too steal from me that knows me. Yes. like that. That's when if I had known the people who stole from me!! I'd be in prison or looking over my shoulders. They would have been permanently unable too steal from anybody by now! Meanwhile in Vegas on cctv hitting the tables, thieves that stole my shit would have been handled in front of their kids, their front yard!!! the police station, freeway, church, or the gas station!! Trust. Us, It will be under my terms. This is just the beginning and I'll see you soon. Lawsuits are chump change and get dragged out, all damages, lawyers are specifically told to sue you both personally. In arbitration I don't settle I get paid. I give 5 options then walk out. Jury of my peers.

"To many people agree insurance adjusters are worse than child molesters and are predators. The bubble bath and razor blades I sent, get the hint. Thieves and insurance fraud/adjusters should be all served American justice. I'll refrain from contacting moving forward (lawyers)via email but you will meet my paid affiliates because of priorities I maybe rescission in chemo but trust its on. Done, no more talk. Just lets wait and see. There is no compromise. Ofcourse expect to be personally sued at the minimum,, there will be silence from me do too chemo but your gonna see what's up! Intuition? Your fuckin pieces of shit! Amber and Debra! you and I. You will not steal or victimize me. trust when I say I'll see you soon. Until then. Have a safe commute bitches don't get in a head on collision or ran over lol I'd buy everybody a round off drinks but I need your testimony lol not until my case is wrapped up. stay healthy stop fuckin people for a living."

This e-mail caused Deborah to be concerned for her and her team's safety. She initially did not know what the reference to bubbles and razor blades was, but then believed it meant defendant wanted her to commit suicide. The e-mail made Amber fear for her and her family's safety.

Defendant's e-mails led Liberty Mutual to hire 24-hour armed security for the Rocklin office. It also hired an outside law firm to obtain a restraining order against

12

defendant for Amber, Stephen, and Deborah. Defendant was served with a temporary restraining order in two locations, in El Dorado County on March 14, and in Placer County on March 19. A hearing on the restraining order was scheduled for March 26.

6. *March 22 E-mail*

Defendant sent the following e-mail to Stephen on March 22:

"I was severed by Placer County in el dorado county I've been sick af with chemo, the 1 st attempt at dealing with your noise. 1 st I'm dealing with chemo. 2nd. I have notified the press, and marketing companies. I want nothing more than to destroy your brand. Campaigns will fly out on Facebook and Instagram regarding your soulless attempt to intimidate me? Please.

"Priorities first and health is number one. Again, I'll deal with your team the way I choose at my time. I'm not asking permission, You chose to wipe and write my policy, I expect you to honor it. Your futile attempt to intimidate this? Your agent status with Liberty Mutual makes you one hell of target. Fuck you. You claim threats? You are skinless reptiles. Again, pictures of my social media with guns? I have all of yours as well. I have replanted all of my weapons until this restraining order lol is addressed, trust This is not over. We are not even started yet.

"Trust, I will pursue your personal assets when lawsuits fly, scared ass people. if you wouldn't harm others then there would bee nothing? At my time; and my choosin. The dumbest thing you could have done is fuck with me at the hospital. I hope the worst upon everybody at liberty."

This caused Stephen to fear for his and his family's safety.

C. *The Arrest and Search*

Placer County Sheriff's Detective Derek Tredinnick made a plan to arrest defendant after he sent the last e-mail in violation of the restraining order. Searching defendant's social media profiles, he found photos of defendant with firearms and other

13

photos related to the Florida school shooting and a shooting in Michigan. He decided to arrest defendant away from his home or vehicle to minimize his access to weapons.

On March 26, defendant drove from his Placerville residence to a Chipotle restaurant in the Nugget Plaza shopping center in Roseville. After going to Chipotle with a female passenger, defendant parked his truck elsewhere in the parking lot, and later left in a rideshare vehicle while the female passenger remained in the truck. The rideshare vehicle dropped defendant off by the courthouse in Roseville, where defendant was arrested as he exited the car.

In an interview after executing a *Miranda*[4] waiver, defendant said he took a Lyft car from his residence to the courthouse. He denied driving his truck or having any firearms in his truck. Defendant was aware of the restraining order and the order required him to turn in his firearms. Defendant told Detective Tredinnick, "Fuck the restraining order," and said he had moved his firearms from his home. Defendant repeatedly refused to give a DNA sample while in custody.

A protective sweep and a subsequent search pursuant to a warrant of defendant's truck found two loaded handguns, some handgun magazines, and a lock pick inside a backpack. Execution of a search warrant on defendant's home found eight firearms and some body armor in an open safe in the master bedroom. Approximately 6,000 rounds of various calibers were found throughout the residence. A second warranted search of the residence found two metal construction job boxes on the property. The boxes had the name of defendant's company, "FamCo," spray painted on them. Three assault rifles were found inside one of the boxes.

---

**4** *Miranda v. Arizona* (1966) 384 U.S. 436 [16 L.Ed.2d 694].

14

*The Defense*

Defendant testified that he was a self-employed contractor in the alarm business and had insurance coverage with Liberty Mutual for personal items with a limit of $50,000. He lived with his son on a rental property owned by Zachary Hall, who lived in a house about 50 yards from defendant's residence.

One of defendant's two U-Hauls was stolen in 2013. It contained power equipment, tools, and metal-working equipment. He filed a claim with Liberty Mutual and received about $21,000 following an investigation taking several months. In November 2017, he contacted Liberty Mutual about revisiting the claim, speaking to Amber. He also talked to Deborah about the claim in late January and early February 2018.

Defendant was diagnosed with cancer in January 2018. Following an operation, he was prescribed several medications that he took in February and March. The medications made him feel agitated, irritable, depressed, and very concerned about his future. He underwent chemotherapy from March 12 to March 19, then sporadically for the following week. The chemotherapy nauseated him and affected his memory. He did not remember being served a restraining order on March 14.

By mid-February, defendant had become frustrated with Liberty Mutual. He was trying to get money that was promised to him years ago and had been told "a lot of stuff that just didn't add up." Defendant filed a complaint with the Department of Insurance and intended to file a lawsuit but did not intend to take any other action.

Defendant swore at Amber and Deborah on the phone but never threatened them or Stephen. He just wanted to meet with someone at the Liberty Mutual office to get to the bottom of his claim. The postings about firearms on his Facebook page were not meant for Amber, Deborah, or Stephen. He did not remember sending e-mails to them.

15

Defendant remembered being handed a piece of paper by deputies two times on March 19, once when stopped on the road while driving with his son, and later at his home. He did not read either paper.

When defendant left for his March 26 court hearing, his firearms were stored in his locked safe as they normally were. He also had ammunition throughout his home. He did not take any weapons with him, carrying only a black portfolio containing medical information. The lock pick in his truck was for work, to open locked boxes with a client's permission. He did not recall having any firearms in his truck that day.

Defendant and his female companion went to a Chipotle restaurant because he was feeling nauseous and had not taken any of his medication. As they started driving 30 minutes later, defendant exited his truck and threw up in the parking lot. He then took his antinausea medication and decided to take a Lyft to the courthouse because his companion could not drive. He was arrested shortly after exiting the Lyft vehicle at the courthouse. He did not know there were firearms in his truck until learning of this during his interrogation. During his interrogation, defendant was anxious, feeling poorly because of his medication, and did not understand what was happening.

A photograph of the open safe taken when his residence was searched showed it in a different condition from the locked safe he left on the day he was arrested. Likewise, the metal boxes found on the second, April 15 search of his residence, were in a different condition than when he left them. The two boxes were normally secured with padlocks. One box contained power tools while the other stored miscellaneous hardware and electrical items. The locks appeared to have been drilled out without his permission and the boxes had been ransacked.

Defendant did not store firearms in the boxes and was surprised that firearms were found there. The firearms in the box were in a different condition than when he last saw them. One of his weapons had a folding stock, but he kept the stock stored in a shop below his residence.

16

Defendant did not remember calling his landlord Hall from jail and asking him to liquidate the tools outside the house.

Dr. Alan Donelson, an expert on pharmacology, testified that the side effects of defendant's medications he was taking and his chemotherapy could interfere with a person's ability to cope or carry out what one wishes to do.

*Rebuttal*

On April 12, defendant called Hall from jail and asked him to "liquidate" the tools outside his house "if it comes to that."

Defendant told a visitor at the jail on March 29 that he had forgotten about the two pistols he had left in the backpack in his truck until he left the Chipotle, so he then decided to take a Lyft to the courthouse.

During a conversation with a female caller on April 27, defendant said, "Assault rifles. I-I mean there is no need for me to do that. I-I can make my guns fucking California compliant or assault rifles and no-no bullshit Probably, not probably, I can do it with a blindfold on."

DISCUSSION

I

*Motion to Suppress and Quash*

Defendant contends the trial court erred in failing to grant his motion to suppress the warrantless search of his truck and to quash the subsequent search warrant. We disagree.

A. *Background*

1. *The Search of Defendant's Truck*

At the hearing on the suppression motion, the trial court took judicial notice that defendant was served with restraining orders on March 14 and March 19. The following evidence was provided through testimony at the hearing.

17

Stephen testified regarding defendant's hostile comments in phone conversations and through e-mails, as well as seeing the photographs of defendant with firearms on his Facebook page.

On March 26, at around 8:00 a.m., Detective Tredinnick and two deputies established surveillance at defendant's residence. At 11:00 a.m., defendant and a passenger entered the truck and drove to a Chipotle restaurant in Roseville. Defendant and the passenger went into the restaurant, then returned to the truck after some time. He drove around the parking lot and parked elsewhere in the parking lot, about 100 yards from the Chipotle. After about 15 to 20 minutes, defendant left the truck and looked around until a small sedan pulled up. Defendant entered the car's rear passenger seat and the sedan drove off. The sedan stopped at the courthouse, where defendant was arrested as he left the car. Defendant declined to consent to search his truck or residence and did not give the combination to the safe in his residence.

Placer County Sheriff's Detective Ken Addison was part of the surveillance team; he remained in the parking lot with defendant's truck after defendant left for the courthouse. He had information that defendant might have multiple assault weapons, causing him to be concerned for officer safety. Detective Addison also knew that defendant had violated the temporary restraining order. Upon learning of defendant's arrest he contacted the passenger in defendant's truck, Amanda Aldrich. Aldrich said she was waiting for defendant to return from the courthouse and did not know why he took a rideshare to the court. Aldrich did not know if there were any weapons in the car. She had seen defendant with guns in the past; she once saw him put a handgun in the truck's center console. Detective Addison had Aldrich exit the truck so he could check the area around her for weapons. Since the parties would be there for a while, he planned to allow Aldrich to sit in the back of the truck if it was free of weapons.

Aldrich was detained while Detective Addison searched the car. He searched the center console, the glovebox, and under the passenger seat. There was a backpack in the

18

middle of the back seat; he lifted the flap of a backpack, where he saw the handle of a handgun. Detective Addison stopped the sweep and informed the detective preparing the search warrant, Placer County Sheriff's Detective Timothy Gualco, about the handgun. The truck was then secured, and Aldrich was not allowed to enter.

After the warrant was issued, defendant's residence was searched, where deputies found numerous firearms and ammunition, as well as body armor. A search of defendant's truck found two loaded firearms, a laptop, and a lock pick set in the backpack.

Aldrich testified that the backpack was directly behind the driver's seat.

2. *The Warrant*

The day after defendant's arrest, Detective Gualco submitted an affidavit in support of a warrant to search defendant's home and truck. The affidavit related the protective order and defendant's e-mail in violation of it, and that the e-mail referenced that he had "replanted all [his] weapons" until the restraining order had been addressed. Defendant had 12 firearms registered to him. The affidavit also noted several concerning posts in defendant's Facebook profile as well as numerous pictures of him holding weapons and other statements regarding threats. The affidavit related that defendant took a rideshare vehicle from his truck to the courthouse where he was arrested. Regarding the protective sweep of the truck, the affidavit stated: "The female was contacted in the passenger seat and a protective sweep of the area she had access to was conducted. In the back seat of the truck was a backpack which had the front flap open. Detectives were able to see the handle of a pistol in the backpack." Detective Gualco opined in the affidavit that defendant was in possession of weapons that would be found in his truck and his residence. The magistrate issued a warrant to search defendant's residence and truck.

19

### 3. *The Motion and Hearing*

Defendant filed a motion to suppress the fruits of the initial sweep of his truck, claiming he was illegally arrested, and the warrantless search of his truck was also unlawful. He later amended the motion to add a motion to quash the search warrant.

The trial court denied the motion to suppress and quash, stating it would later provide a written ruling. Later on, the court explained it denied the motion because the deputies had the authority to search the truck under Supreme Court authority allowing warrantless searches of a vehicle for officer safety.

### B. *The Warrantless Search of the Truck was Valid*

Defendant asserts the trial court erred because the warrantless search of his truck was unlawful and the evidence obtained from that, the presence of a handgun in the backpack, fatally tainted the affidavit supporting the search warrant.

The Fourth Amendment guarantees the right to be free from unreasonable searches and seizures. (U.S. Const., 4th Amend.) Warrantless searches and seizures are per se unreasonable, "subject only to a few specifically established and well-delineated exceptions." (*Katz v. United States* (1967) 389 U.S. 347, 357 [19 L.Ed.2d 576, 585].) A warrantless search is constitutional when the circumstances make it reasonable, within the meaning of the Fourth Amendment, to dispense with the warrant requirement. (*Kentucky v. King* (2011) 563 U.S. 452, 462 [179 L.Ed.2d 865, 876].)

This case involves two possible justifications for the warrantless search of defendant's truck, the automobile exception, and the officer safety exception.

The "protection of police and others can justify protective searches when police have a reasonable belief that the suspect poses a danger that roadside encounters between police and suspects are especially hazardous, and that danger may arise from the possible presence of weapons in the area surrounding a suspect." (*Michigan v. Long* (1983) 463 U.S. 1032, 1049 [77 L.Ed.2d 1201, 1219-1220].) "[L]aw enforcement officers have a legitimate need to protect themselves even where they may lack probable cause for an

20

arrest. [Citation.] The officer has an immediate interest in taking steps to ensure that the person stopped 'is not armed with a weapon that could unexpectedly and fatally be used' against the officer. [Citation.]" (*In re H.M.* (2008) 167 Cal.App.4th 136,143.) "[T]he officer need not be absolutely certain that the individual is armed; the crux of the issue is whether a reasonably prudent person in the totality of the circumstances would be warranted in the belief that his or her safety was in danger. [Citation.]" (*People v. Avila* (1997) 58 Cal.App.4th 1069, 1074.)

The automobile exception allows for warrantless searches of automobiles where an officer has probable cause to believe the vehicle contains contraband or evidence of a crime. (*People v. Evans* (2011) 200 Cal.App.4th 735, 753.) Probable cause to search exists "where the known facts and circumstances are sufficient to warrant a man of reasonable prudence in the belief that contraband or evidence of a crime will be found, [Citation.]" (*Ornelas v. United States* (1996) 517 U.S. 690, 696 [134 L.Ed.2d 911, 918].) An officer who has probable cause to search pursuant to the automobile exception may then conduct a probing search of all "compartments and containers within the vehicle whose contents are not in plain view." (*United States v. Ross* (1982) 456 U.S. 798, 800 [72 L.Ed.2d 572, 578].)

We review the court's denial of defendant's suppression motion under the following well-established standard: "We defer to the trial court's factual findings, express or implied, where supported by substantial evidence. In determining, on the facts so found, the search or seizure was reasonable under the Fourth Amendment, we exercise our independent judgment. [Citations.]" (*People v. Glaser* (1995) 11 Cal.4th 354, 362.)

Although the trial court denied the motion on the basis of *Michigan v. Long, supra,* 463 U.S. 1032 and other officer safety exceptions to the search warrant, we need not determine whether this exception applied because Detective Addison had probable cause to suspect a firearm was in the areas of the truck he searched. He knew defendant had violated the restraining order and was to be arrested that day for criminal threats and

21

felony violation of the restraining order. The restraining order required defendant to relinquish his firearms within 24 hours of receipt; failure to do so was a crime. (§ 29825.) Based on his training and experience, Detective Addison knew it was common for people to keep their guns in their vehicles. (See *People v. Letner and Tobin* (2010) 50 Cal.4th 99, 145-146 [officers may draw on training and experience to make inferences and deductions from the available information].) Aldrich told Detective Addison while she did not know if there were firearms in the truck, she knew defendant would carry firearms and once had put a handgun in the truck's center console. Detective Addison also knew defendant had weapons, having seen the Facebook photos of him holding weapons, and had discussed with other detectives the goal of arresting defendant, getting him into custody, and finding his firearms. Defendant's unusual method of going to the courthouse, driving from his Placerville residence to a strip mall parking lot in Roseville, then taking a rideshare to the courthouse is consistent with an intent to separate himself from his truck while he was at court, reinforcing the suspicion he may be carrying something illegal, such as firearms, in his truck.

Taken together, this provides probable cause that defendant may have firearms in his car, a violation of the temporary restraining order, and a crime. Although Addison only saw defendant store a handgun in the center console, probable cause to search was not limited to this area, as she did not say this was the only place he would store firearms in the truck. Finding the scope of the sweep of the truck was reasonable in light of the information available to Detective Addison, we conclude the trial court did not err in denying the motion to suppress the fruits of the warrantless search of the truck.

Defendant's claim that the search warrant was insufficient without the information from the warrantless search that a handgun was in the backpack fails as well. The firearm found in defendant's truck, plus the mention of firearms in his e-mail to Stephen,

the firearm photographs on his Facebook page, and the fact that he had 12 firearms registered to him, support probable cause to search his residence and truck.[5]

## II

### *Unanimity Instruction*

Defendant contends the trial court erred in failing to give a unanimity instruction for the criminal threats charges in counts one through five.

"In a criminal case, a jury verdict must be unanimous." (*People v. Russo* (2001) 25 Cal.4th 1124, 1132.) "Additionally, the jury must agree unanimously the defendant is guilty of a *specific* crime. [Citation.] Therefore, cases have long held that when the evidence suggests more than one discrete crime, either the prosecution must elect among the crimes or the court must require the jury to agree on the same criminal act. [Citations.]" (*Ibid*.) "The key to deciding whether to give the unanimity instruction lies in considering its purpose. The jury must agree on a 'particular crime' [citation]; it would be unacceptable if some jurors believed the defendant guilty of one crime and other jurors believed [his or her] guilty of another. But unanimity as to exactly how the crime was committed is not required. Thus, the unanimity instruction is appropriate 'when conviction on a single count could be based on two or more discrete criminal events,' but not 'where multiple theories or acts may form the basis of a guilty verdict on one discrete criminal event.' [Citation.] In deciding whether to give the instruction, the trial court must ask whether (1) there is a risk the jury may divide on two discrete crimes and not agree on any particular crime, or (2) the evidence merely presents the possibility the jury may divide, or be uncertain, as to the exact way the defendant is guilty of a single

---

[5] Defendant also attacks the legality of his arrest. We do not address his arrest as its validity is irrelevant to legality of the warrantless search of his truck or the validity of the warrant.

discrete crime. In the first situation, but not the second, it should give the unanimity instruction." (*Id*. at pp. 1134-1135.)

An exception to the unanimity instruction requirement is when the crime is charged through a continuous course of conduct. The continuous course of conduct exception can arise under two situations: " 'when the acts are so closely connected that they form part of one and the same transaction, and thus one offense' or 'when . . . the statute contemplates a continuous course of conduct [of] a series of acts over a period of time.' [Citation.]" (*People v. Hamlin* (2009) 170 Cal.App.4th 1412, 1427.) If a criminal statute can be violated by both individual acts and a course of conduct, the exception's application depends on whether the prosecution's case was based on individual acts or a course of conduct. (See *id*. at p. 1451 ["where those incidents can reasonably be found to constitute a course of conduct, and the prosecution charges the crime as a course of conduct, no unanimity instruction is required"]; *People v. Sanchez* (2001) 94 Cal.App.4th 622, 634-637 [analyzing prosecution's case and evidence to determine necessity of unanimity instruction].)

The criminal threats counts were based on the various e-mails defendant sent to the three Liberty Mutual employees, with counts one through three as based respectively on the e-mails sent to Stephen on February 28, March 2, and March 22, and counts four and five based on the same e-mail defendant sent to Deborah and Amber on March 5. Defendant claims this was insufficient because the e-mails were lengthy and varied between business concerns and angry rants, with each e-mail containing several threatening statements from which the jury could choose. According to defendant, since the prosecutor did not elect which particular statement in each e-mail constituted the threat, a unanimity instruction was required.

Neither further election nor a unanimity instruction was required here because each specific e-mail constitutes its own course of conduct. Here, each of the e-mails underlying the respective charges was a separate discrete effort to threaten the recipient;

24

the threatening statements contained within each e-mail constituted a single course of events. *People v. Dieguez* (2001) 89 Cal.App.4th 266 illustrates this point. There, the defendant was convicted of one count of making a false material statement in support of a workers' compensation claim. (*Id.* at pp. 270-271.) Although the charge was based on a series of false statements the defendant made during a medical visit, no unanimity instruction was needed as the statements "were successive, compounding, and interrelated one to another; they were all aimed at the single objective of obtaining workers' compensation benefits . . . ." (*Id*. at p. 275.) The same applies here. While, as defendant points out, the prosecutor's argument also referenced other statements made by defendant in other e-mails, phone conversations, and his Facebook posts, these simply provided context for the statements contained in each of the charged e-mails. In order to convict defendant of criminal threats, the jury had to find that the particular e-mail referenced in the charge satisfied the elements of the offense. No unanimity instruction was required here.

### III

#### *Attempted Criminal Threats Instruction*

The jury was instructed with attempted criminal threats as a lesser included offense of criminal threats in counts one through five.

The Bench Notes for CALCRIM No. 460 state that when the attempted crime is criminal threats, the court must instruct on a third element to comply with *People v. Chandler* (2014) 60 Cal.4th 508, 525 (*Chandler*), that is, "[t]he intended criminal threat was sufficient under the circumstances to cause a reasonable person to be in sustained fear."[6]

---

[6]     *Chandler* stated that the offense of attempted criminal threat requires proof that "defendant had a subjective intent to threaten and that the intended threat under the

25

Defendant contends and the Attorney General concedes that the trial court prejudicially erred in failing to instruct the jury on the required third element for attempted criminal threats. We agree.[7] A trial court has a duty to instruct sua sponte on the general principles of law applicable to the case, including lesser included offenses. (*People v. Taylor* (2010) 48 Cal.4th 574, 623.) At the time of defendant's trial, CALCRIM No. 460 included the third element for attempted criminal threats.

An instruction that omits an element is reversible unless the error is harmless beyond a reasonable doubt. [Citations.]" (*Chandler, supra*, 60 Cal.4th at p. 525.) In only a "narrow class of cases" will omitting an element be harmless beyond a reasonable doubt. (*Neder v. United States* (1999) 527 U.S. 1, 17, fn. 2 [144 L.Ed.2d 35, 52, fn. 2].)

The primary defense to the criminal threats charges was that the threats were rants rather than true threats, and the rant contained in the February 28 e-mail underlying count one was even milder than the other ones. Given the facts of this case and this defense theory, we cannot conclude beyond a reasonable doubt that the failure to instruct on the reasonable person standard did not affect the verdict on count one.

Since there is sufficient evidence to support this conviction, the People may elect to retry defendant on this count on remand. (See *People v. Eroshevich* (2014) 60 Cal.4th 583, 591 [retrial after reversal permitted except when evidence was insufficient].)

circumstances was sufficient to cause a reasonable person to be in sustained fear." (*Chandler, supra*, 60 Cal.4th at p. 525.)

[7]    Since defendant was convicted of criminal threats in counts two through five, the error is harmless as to those counts. We address only the error's prejudice as to count one.

IV

*Criminal Threats*

Defendant asserts there is insufficient evidence to support his criminal threats convictions (counts two to five) and that the convictions violated the First Amendment because the communications upon which they were based involved protected speech.[8]

A. *Applicable Legal Principles*

The First Amendment is not offended when a state bans a "true threat." (*Chandler, supra*, 60 Cal.4th at p. 519; *Virginia v. Black* (2003) 538 U.S. 343, 359 [155 L.Ed.2d 535, 551].) " ' "True threats" encompass those statements where the speaker means to communicate a serious expression of an intent to commit an act of unlawful violence to a particular individual or group of individuals. [Citations.] The speaker need not actually intend to carry out the threat. Rather, a prohibition on true threats "protect[s] individuals from the fear of violence" and "from the disruption that fear engenders," in addition to protecting people "from the possibility that the threatened violence will occur." [Citation.] Intimidation in the constitutionally proscribable sense of the word is a type of true threat, where a speaker directs a threat to a person or group of persons with the intent of placing the victim in fear of bodily harm or death.' " (*Chandler,* at p. 519.) " 'When a reasonable person would foresee that the context and import of the words will cause the listener to believe he or she will be subjected to physical violence, the threat falls outside First Amendment protection.' " (*People v. Toledo* (2001) 26 Cal.4th 221, 233, italics omitted.)

Our Supreme Court has clarified that section 422 has five elements that must be established by the prosecution: (1) the defendant willfully threatened to commit a crime that would result in death or great bodily injury to another person, (2) the defendant made

_____

[8] Defendant does not contest the factual sufficiency or contend any infringement on his free speech rights for his conviction for attempted criminal threats in count one.

the threat with the specific intent that it would be taken as a threat, even if he did not intend to carry it out, (3) the threat was, on its face and under the surrounding circumstances, so unequivocal, unconditional, immediate, and specific as to convey a gravity of purpose and immediate prospect of execution, (4) the person threatened was placed in sustained fear for his or her own safety or that of his or her immediate family, and (5) the fear was reasonable under the circumstances. (*People v. Toledo, supra*, 26 Cal.4th at pp. 227-228.)

"[S]ection 422 requires that the communication must be sufficient 'on its face and under the circumstances in which it is made' to constitute a criminal threat. This means that the communication and the surrounding circumstances are to be considered together. 'Thus, it is the circumstances under which the threat is made that give meaning to the actual words used. Even an ambiguous statement may be a basis for a violation of section 422.' [Citations.]" (*In re Ryan D.* (2002) 100 Cal.App.4th 854, 860.) "To constitute a criminal threat, a communication need not be *absolutely* unequivocal, unconditional, immediate, and specific. The statute includes the qualifier 'so' unequivocal, etc., which establishes that the test is whether, in light of the surrounding circumstances, the communication was *sufficiently* unequivocal, unconditional, immediate, and specific as to convey to the victim a gravity of purpose and immediate prospect of execution. [Citation.]" (*Id.* at p. 861.) The word "immediate" has been interpreted to mean "that degree of seriousness and imminence which is understood by the victim to be attached to the future prospect of the threat being carried out, should the conditions not be met." (*People v. Melhado* (1998) 60 Cal.App.4th 1529, 1538.)

In order to make sure that a conviction for making a criminal threat does not improperly intrude on protected speech, "a reviewing court should make an independent examination of the record in a section 422 case when a defendant raises a plausible First Amendment defense to ensure that a speaker's free speech rights have not been infringed by a trier of fact's determination that the communication at issue constitutes a criminal

28

threat. [Citation.]" (*In re George T.* (2004) 33 Cal.4th 620, 632 (*George T.*).) "Independent review is not the equivalent of de novo review 'in which a reviewing court makes an original appraisal of all the evidence to decide whether or not it believes' the outcome should have been different. [Citation.] Because the trier of fact is in a superior position to observe the demeanor of witnesses, credibility determinations are not subject to independent review, nor are findings of fact that are not relevant to the First Amendment issue. [Citations.] . . . [U]nder independent review, an appellate court exercises its independent judgment to determine whether the facts satisfy the rule of law." (*Id*. at p. 634.)

If applicable, independent review of a plausible First Amendment defense does not subsume the substantial evidence standard. "[I]f independent review is appropriate, it is applicable only to issues that could implicate the First Amendment, such as the content of appellant's communications; sufficiency of the evidence to support the jury's finding on intent is determined according to the usual substantial evidence standard. [Citations.]" (*People v. Lopez* (2015) 240 Cal.App.4th 436, 447.)

If there is no plausible First Amendment claim, then we review under the substantial evidence standard. (*People v. Wilson* (2010) 186 Cal.App.4th 789, 805.)[9] Under that standard, we review the record in the light most favorable to the judgment, to determine whether it discloses substantial evidence—evidence that is "reasonable, credible and of solid value—from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. [Citations.]" (*People v. Snow* (2003) 30 Cal.4th 43, 66.) We draw all available inferences supporting the jury's verdict. (*People v. Olguin* (1994) 31 Cal.App.4th 1355, 1382.) " 'If the circumstances reasonably justify the trier of fact's findings, the opinion of the reviewing court that the circumstances

---

[9] Defendant raises numerous substantial evidence claims against his convictions on other counts. We apply the same deferential substantial evidence standard to all of them.

might also be reasonably reconciled with a contrary finding does not warrant a reversal of the judgment.' " (*People v. Hicks* (1982) 128 Cal.App.3d 423, 429.)

B. *First Amendment*

Defendant did not raise a First Amendment defense at trial, although the trial court stated at sentencing that it considered "the issue of constitutional speech for the 422 offenses." Defendant asserts the First Amendment issue is not forfeited and asks us to conduct an independent review under *George T.*

In the context of penalizing threats, "the goal of the First Amendment is to protect expression that engages in some fashion in public dialogue, that is, ' "communication in which the participants seek to persuade, or are persuaded; communication which is about changing or maintaining beliefs, or taking or refusing to take action on the basis of one's beliefs . . . ." ' [Citations.] As speech strays further from the values of persuasion, dialogue and free exchange of ideas, and moves toward willful threats to perform illegal acts, the state has greater latitude to regulate expression." (*In re M.S.* (1995) 10 Cal.4th 698, 710.)

In *George T.*, a minor high school student was prosecuted for making a criminal threat by writing a violent "dark" poem for a poetry class. (*George T., supra*, 33 Cal.4th at p. 625.) The minor argued punishing him for the poem implicated First Amendment interests warranting independent review. (*George T.,* at p. 631.) The California Supreme Court held that the minor had raised a plausible First Amendment defense, because the creatively ambiguous expression inherent in his poem presented "unique circumstances." (*George T.,* at p. 634.) In light of *George T.*'s holding, a plausible First Amendment defense requires that the words at issue and their surrounding circumstances exhibit, on their face, the hallmarks of protected speech, such as advancing creative expression, dialogue, the expression of emotions or feelings, persuasion, or the exchange of ideas or opinions.

30

While complaints to insurers or other businesses often involve First Amendment activities, defendant's series of hostile, threatening e-mails to the three Liberty Mutual employees in this case do not implicate the First Amendment as understood in *George T.* Although substantial portions of the e-mails do not contain threats, those parts did not form the basis of defendant's convictions. As we shall discuss, those parts directly threatening or raising implied threats to the three victims did not involve the exchange of ideas or attempts to persuade through constitutionally protected means. The absence of a plausible First Amendment defense is reinforced by defendant's failure to raise a First Amendment defense at trial. Since defendant does not raise a plausible First Amendment claim, we review for substantial evidence.

*C. Threats*

This is not a typical criminal threats case where the threat or threats in question were part of a single, relatively concise communication. (See, e.g., *In re Sylvester C.* (2006) 137 Cal.App.4th 601, 604 [threats to "kick your ass" and to "kill you and I will kill everybody there" following confrontation in parking lot]; *People v. Orloff* (2016) 2 Cal.App.5th 947, 953 [telephone call threatening, "You're dead"]; *People v. Roles* (2020) 44 Cal.App.5th 935, 940 [series of 11 threatening voicemails left in a single day].) The claimed threats here are contained within several e-mails that are part of increasingly acrimonious communication from defendant to employees at his insurance company involving his dispute over a denied claim. The prosecutor argued that certain phrases within some of the e-mails were the charged threats; significant portions of each of the e-mails in question were not threatening. The main question here is whether the statements in question can be considered threats when viewed in the context of their particular e-mails and defendant's overall communications with Liberty Mutual.

1. *Prior Communications*

The e-mails here were preceded by defendant's telephone conversations with Liberty Mutual employees. Deborah testified that when she told defendant over the

31

phone on February 26 that an investigator had been assigned to his claim, he replied, "I will show you that I have guns," and that he was going to the Rocklin office because he wanted to get his money. Following the phone call, defendant sent Deborah an e-mail stating: "Trust me, when I say I dispise thieves! when I say if I had caught and had evidence who the thieves were I woulda executed them in front of their kids." On February 27, defendant sent an e-mail to Deborah and Amber where he told them: "Now your assigning this to an investigator for the second time. O.k. I'm personally going to address this on the personal level. Have the law enforcement contact me? hahaha, look I'm collecting what's mine i'm not asking permission."

While defendant does not contest the evidentiary support for his attempted criminal threats conviction, the e-mail that forms the basis of that count, the February 28 e-mail, likewise provides context for the e-mails underlying the criminal threats convictions. In that e-mail, which is sent to Stephen and Deborah and copied to Amber, defendant tells them, "I fully am prepared to collect what's rightfully owed to me whatever level this needs to go." He also wrote, "Liberty Mutual, and named agents are not in reason and will be met with the same fury. I'm now pushed into a corner. I'm warming up for a fight, battle, and unneeded war with you over what's right?!"

These statements, while not satisfying the threat element of section 422, nonetheless provide important context for considering whether defendant committed criminal threats in subsequent communications. Telling Deborah that he had guns and would show them to her strongly suggests a willingness to resort to firearms to resolve the dispute.[10] Defendant's other communications showed a willingness to kill those

---

[10] While this was made in a phone conversation with Deborah, she related this phone call to the Rocklin office where Stephen and Amber worked as well as contacting corporate security about it. She also discussed defendant's communications with Amber, and Stephen; Stephen also read defendant's file. A jury could reasonably infer that all

whom he believed stole from him, the dispute was "personal," and an intent to escalate the matter until it was resolved in his favor, even if it meant escalating to "war."

2. *March 2 E-mail to Stephen (Count Two)*

The e-mail underlying defendant's criminal threats conviction in count two, the March 2 e-mail to Stephen, contained a statement from defendant that, "I'll just go to a different jurisdiction. I'm not asking permission from anyone." Defendant also told Stephen, "I don't give a fuck about the trespassing I'll be out in what 24 hours max!! probably 6," and said, "no other solution than me or escalation of whatever level. Play games with someone who plays. I never play." He also said, regarding Liberty Mutual employees, "Your crooks. not me." These statements, evaluated in the context of his prior communications with Liberty Mutual, can reasonably be read to contain a threat to kill or inflict serious injury on the recipient, Stephen. Defendant's prior statement regarding the use of guns, his willingness to escalate to the point of war, and that the matter was personal, all reinforce the threatening nature of his statements in the e-mail regarding his disregard for trespassing and that he never plays games. His claim in the e-mail that Liberty Mutual employees were thieves is threatening when read in context of his prior communication that he would execute thieves. A jury could reasonably infer from this that, if his claim was not satisfied, defendant would trespass on Liberty Mutual property and execute the Liberty Mutual employees who were stealing from him.

Defendant calls these posts vague and ambiguous and contends they should be read in the context of defendant's reaction to learning that Liberty Mutual employees and Rocklin police visited his Facebook page and interpreted his posts as threatening. He points out that the March 2 e-mail also contained a passage accusing Stephen of lying

---

three employees had general knowledge of defendant's communications with Liberty Mutual.

about "the Florida shooting"[11] and "Hopefully Liberty Mutual and any case doesn't end up on the media but not with no fuckn weapons you scared little punks!!! Deborah made these gloves come off with her mouth. Amber lied! maybe dont fuck people for a living then you wouldn't have that thought. But no other solution than me or escalation of whatever level. Play games with someone who plays. I never play." He also notes the e-mail later accuses Liberty Mutual of using the current political environment to get the law to stop him, reiterates his request to have the matter resolved promptly, and promises to employ a media campaign and lawsuits against Liberty Mutual. Finally, defendant asserts his references to the matter being personal came after he accused Liberty Mutual of manipulating information, as he wrote: "Your team is again manipulating information and I highly take that as personal. It is personal. And im going to address each one of you." Defendant concludes that he did not threaten Stephen in the March 2 letter when read in this context.

Defendant's interpretation overlooks the context provided by his prior communications. Looking at the e-mail in its entirety and also in light of the prior communications, it is reasonable to conclude this e-mail satisfied the threat requirement of section 422.

3. *March 22 E-mail (Count Three)*

In the March 22 e-mail to Stephen, defendant said, "I'll deal with your team the way I choose at my time. I'm not asking permission." He also told Stephen, "Your agent status with Liberty Mutual makes you one hell of target." A little later he stated, "I have replanted all of my weapons until this restraining order lol is addressed, trust This is not over. We are not even started yet." He concludes the e-mail with "I hope the worst upon

_____

**11** A reference to the Parkland, Florida school shooting, which took place on February 14, 2018. (See *Medina v. Pollack* (Fla. Dist. Ct. App. 2020) 300 So.3d 173, 174.)

everybody at liberty." From this and the prior communications, a jury could reasonably conclude defendant threatened to escalate to using weapons against his target, Stephen, if the matter was not resolved to his satisfaction.

Defendant notes his e-mail also contains references to defendant filing lawsuits against Liberty Mutual. Likewise, defendant's comment about replanting his guns was made after defendant stated, "Again, pictures of my social media with guns? I have all of yours as well." As with defendant's argument regarding the March 5 e-mail to Amber and Deborah, these statements might support a reasonable inference that the statements were not threatening if viewed alone, but read in light of the rest of the e-mail as well as defendant's other communications, it does not require a different result. This e-mail constituted a threat under section 422.

### 4. *March 5 E-mail to Amber and Deborah (Counts Four & Five)*

In this e-mail, defendant told Amber and Deborah, "Besides the theft by some random thieves no one's stupid enough too steal from me that knows me. Yes. like that. That's when if I had known the people who stole from me!! I'd be in prison or looking over my shoulders. They would have been permanently unable too steal from anybody by now! Meanwhile in Vegas on cctv hitting the tables, thieves that stole my shit would have been handled in front of their kids, their front yard!!!" A little later he told them, "It will be under my terms. This is just the beginning and I'll see you soon."

Defendant begins the last paragraph of the e-mail: "To many people agree insurance adjusters are worse than child molesters and are predators. The bubble bath and razor blades I sent, get the hint. Thieves and insurance fraud/adjusters should be all served American justice." He concludes with, "stay healthy stop fuckin people for a living."

This e-mail to an insurance adjuster and her supervisor equates insurance adjusters with child molesters and with thieves. Defendant previously stated he would kill those who stole from him and the statements in this e-mail strongly suggest his willingness to

35

do so to the insurance adjuster "thieves" who stole from him, Amber and Deborah. As with the other e-mails, defendant again threatened to file lawsuits, but these references do not overcome the reasonable inference the jury could draw that defendant threatened the recipients with death or great bodily injury.

*Remaining Elements*

The e-mails in question also satisfy the remaining elements of criminal threats. The hostility of defendant's lengthy discourse with Amber, Stephen, and Deborah supports inferring an intent to threaten, which is further supported by defendant's motive in expeditiously obtaining a favorable result for his insurance claim. (See *People v. Smith* (2005) 37 Cal.4th 733, 740-741 [motive as circumstantial evidence of intent to kill].) The fact that defendant proclaimed in some of his e-mails that he was not threatening them does not, as defendant contends, negate the intent element.[12] A jury is not required to take defendant's claims not to be threatening at face value, where, as here, his communications contain numerous threatening statements. There is substantial evidence of intent to threaten.

The third element of criminal threats is met as well. The references to firearms in the e-mails, claims he could bypass their security, along with the Facebook photos showing him with firearms, support the inference that defendant could immediately carry out his threats. His repeated statements that he would do things on his terms or would not be deterred by police or security, support a finding that he was willing to carry out his threats without regard to countermeasures taken against him, thus reinforcing the immediacy of the threats. Defendant also stated in a February 27 e-mail to Stephen and

---

[12]     In the February 28 e-mail to all three victims, defendant said, "I didn't threaten that day. I asked simply a real question about verifying." In a March 2 e-mail to Stephen, defendant wrote, regarding his arrival at the Rocklin office, "I'm not going to physically hurt anybody."

in the February 28 e-mail to all three victims that he had considerable resources to devote to the matter likewise suggest he could carry out his threats against Deborah even though she lived and worked in another state. Taken together, these support a finding that the threats contained the necessary gravity of purpose and immediate threat of execution to support the convictions.[13]

The final two elements, that the victims sustained fear and the fear was reasonable, are likewise supported by substantial evidence. All three victims testified that defendant's threatening e-mails placed them in fear and testified to how this changed their lives. Amber installed a security system in her home, Deborah removed her photograph and phone number from her Facebook profile, Stephen checked his home security system and firearms, and their employer obtained a temporary restraining order against defendant to protect them. This shows all three victims sustained fear. Given the nature of the threats and defendant's Facebook photo showing him with firearms and the caption, "Stay away from Liberty Mutual they will take your money but make you fight your policy coverages regardless of your health," such fear was reasonable.

Since all five elements were met, substantial evidence supports the criminal threats convictions.

V

*Duplicate Stalking Counts*

Defendant was convicted in count six of violating section 646.9, subdivision (b) by stalking Stephen in communications between February 28 and March 22, and in count

---

[13]    Defendant's reliance on *In re Ricky T.* (2001) 87 Cal.App.4th 1132 is misplaced. In that case, the minor made an angry but ambiguous threat to " 'get' " a person who was not present and would have had no way of knowing about the threat at the time, then did nothing to follow up on it, and had no history of animosity with the purported victim. (*Id.* at pp. 1136-1137, 1138-1139.) Defendant's numerous threats in many hostile e-mails, and his willingness to make a hostile communication after the temporary restraining order was in place all distinguish *Ricky T.*

seven of violating section 646.9, subdivision (a) based on communications with Stephen between February 23 and March 5.

Defendant contends one of the counts must be dismissed because they are part of the same course of conduct and because subdivision (b) of section 646.9 is an alternate punishment provision rather than a substantive offense.  The Attorney General agrees.  So do we.

"Any person who willfully, maliciously, and repeatedly follows or willfully and maliciously harasses another person and who makes a credible threat with the intent to place that person in reasonable fear for his or her safety, or the safety of his or her immediate family is guilty of the crime of stalking . . . ."  (§ 646.9, subd. (a).)  The base offense is punished either as a misdemeanor or felony.  (*Ibid*.)  If, however, a person "violates subdivision (a) when there is a temporary restraining order, injunction, or any other court order in effect prohibiting the behavior described in subdivision (a) against the same party, [that person] shall be punished by imprisonment in the state prison for two, three, or four years."  (§ 646.9, subd. (b).)

Subdivision (b) of section 646.9 does not state a separate offense; it is an alternative punishment provision for the crime of stalking.  (*People v. Muhammad* (2007) 157 Cal.App.4th 484, 492.)  In addition, the acts in counts six and seven are part of a single course of conduct, defendant stalking Stephen through harassing e-mails as part of his dispute with Liberty Mutual.  Since defendant can be convicted of only one stalking offense, we must vacate one of the counts.  (*Id.* at p. 494.)  The trial court chose count six as the principal term, so we shall vacate count seven.

VI

*Stalking:  Sufficiency of the Evidence and First Amendment*

Defendant claims there is insufficient evidence to support his stalking convictions and the convictions violated his First Amendment free speech rights.

38

A. *Count Six*

One element of stalking in violation of a restraining order is that defendant "violates subdivision (a) of section 646.9 when there is a temporary restraining order . . . in effect prohibiting the behavior described in subdivision (a) against the same party." (§ 646.9, subd. (b).) Noting that stalking is a course of conduct offense which requires "two or more acts over a period of time" (§ 646.9, subd. (f)), defendant claims he did not stalk Stephen in violation of the restraining order because the restraining order was issued on March 12 and he sent Stephen only one e-mail after that, on March 22.

The elements of stalking are: "(1) following or harassing another person; (2) making a credible threat; and (3) intending to place the victim in reasonable fear for her safety." (*People v. Uecker* (2009) 172 Cal.App.4th 583, 594.) As noted in the prior section, subdivision (b) is an alternative penalty provision of section 646.9. It is "triggered when the offense of stalking as defined in subdivision (a) of that section is committed by a person with a specified history of misconduct." (*People v. Muhammed, supra*, 157 Cal.App.4th at p. 494.) Accordingly, "the jury does not consider the truth of these penalty facts until it has reached a verdict on the substantive stalking offense under subdivision (a)." (*Ibid*.)

"A continuing course of conduct crime is not completed by a discrete act; the continuous course of conduct is complete when the last criminal act is performed. [Citations.]" (*People v. Chilelli* (2014) 225 Cal.App.4th 581, 585.) This means application of a newly amended law increasing punishment for a defendant convicted of stalking does not violate the ex post facto prohibitions of the state and federal constitutions as long as some of the course of conduct ended after the amendment took effect. (See *id.* at pp. 590-591 [change of law reducing conduct credits applicable where amendment took effect before course of conduct concluded].) Likewise, since the substantive offense of stalking is not a series of discrete acts but one continuing course of conduct, so long as part of the conduct takes place after a "temporary restraining order,

39

injunction, or any other court order" defined in section 646.9, subdivision (b) is in effect, then the defendant can be subject to subdivision (b)'s penalty provisions.

Such is the case here. Since the course of conduct underlying the stalking offense in count six did not conclude until the March 22 e-mail sent to Stephen after the temporary restraining order was in effect, defendant was subject to subdivision (b). Substantial evidence supports the stalking conviction and the true finding on the alternative penalty provision.

B. *First Amendment*

Defendant next claims his stalking convictions in counts seven through nine violate his First Amendment free speech rights. This contention reiterates his First Amendment claim regarding his criminal threats conviction. As with the criminal threats convictions, his First Amendment claim fails here as well. A series of threatening communications that satisfy the elements of stalking is not protected by the First Amendment. (*People v. Halgren* (1996) 52 Cal.App.4th 1223, 1231.) Where, as here, some of the communications included true threats to seriously injure or kill the victims, the case against a First Amendment violation is even stronger.

C. *Legitimate Purpose and Credible Threat*

Defendant contends there is insufficient evidence to support the stalking convictions because defendant's communications underlying these counts served a legitimate purpose and he did not make a credible threat to the recipients because he did not intend to place them in fear for their safety. Both claims are without merit.

Actions that serve a legitimate purpose are not considered harassment under the stalking statute. (§ 646.9, subd. (e) ["For the purposes of this section, 'harasses' means engages in a knowing and willful course of conduct directed at a specific person that seriously alarms, annoys, torments, or terrorizes the person, and that serves no legitimate purpose"].) Defendant claims his e-mails had a legitimate business purpose, the dispute over his insurance claim. While defendant was in a dispute with Liberty Mutual and its

employees over his claim, engaging in harassing and threatening communications with them serves no legitimate business purpose. The phrase "serves no legitimate purpose" in the stalking statute is assessed from "the view of the victim or a reasonable person" rather than the defendant. (*People v. Tran* (1996) 47 Cal.App.4th 253, 260.) While defendant may have felt his harassing and threatening communications served the legitimate purpose of addressing his dispute with Liberty Mutual, a reasonable person would not.

Defendant argues there is insufficient evidence of credible threat because the victims became fearful after viewing defendant's Facebook posts that were not part of his communications with Liberty Mutual and which he did not intend for the victims to view.[14] The fact that the victims found out about defendant's Facebook posts on their own rather than through a communication defendant directed at them in no way diminishes the credibility of defendant's threats. " '[I]n determining whether a threat occurred, the entire factual context, including the surrounding events and the reaction of the listeners, must be considered.' [Citation.] We therefore cannot ignore what a victim knows about a defendant, regardless of how it is learned, in assessing whether a defendant's behavior rises to the level of a credible threat." (*People v. Uecker, supra*, 172 Cal.App.4th at p. 598, fn. 10.) That the victims were able to find defendant's Facebook page and access his posts supports an inference that his page and posts therein

---

[14] "Credible threat" is defined in the stalking statute as "a verbal or written threat, including that performed through the use of an electronic communication device, or a threat implied by a pattern of conduct or a combination of verbal, written, or electronically communicated statements and conduct, made with the intent to place the person that is the target of the threat in reasonable fear for his or her safety or the safety of his or her family, and made with the apparent ability to carry out the threat so as to cause the person who is the target of the threat to reasonably fear for his or her safety or the safety of his or her family. It is not necessary to prove that the defendant had the intent to actually carry out the threat." (§ 646.9, subd. (g).)

41

were meant for public viewing. The jury could consider this evidence and it was reasonable for the jury to infer a credible threat based on the content of all of defendant's communications with Liberty Mutual employees, as well as the contents of his Facebook page.

Defendant's other argument, that the term "credible threat" was obfuscated by testimony from law enforcement officers regarding threat assessments they conducted, does not address the sufficiency of the evidence supporting the stalking convictions.[15] Defendant does not claim the testimony was improper or that it warranted additional instruction; we are not convinced.

Substantial evidence supports the stalking convictions.

VII

*Facebook Page Evidence*

Over a defense objection, the trial court admitted posts from defendant's Facebook page. Defendant contends this was an abuse of discretion. He claims the Facebook postings were inadmissible character evidence under Evidence Code section 1101, and their probative value was substantially outweighed by their prejudicial impact, and the probability it would mislead or confuse the jury.

Generally, evidence of a person's prior criminal acts is inadmissible to prove a person's propensity to commit similar acts on a separate occasion. (Evid. Code, § 1101, subd. (a).) But this rule does not affect the admissibility of evidence to prove some other relevant fact, such as an element of the offense. (Evid. Code, §§ 1101, subds. (b) & (c), 210.) Nonetheless, the court may exclude relevant evidence "if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue

---

[15] Law enforcement officers testified that defendant presented as being a potential threat, information from the FBI came across as a threat assessment, and a threat assessment of defendant concluded he was a very high risk.

42

consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury." (Evid. Code, § 352.)

We review the admission of evidence under Evidence Code sections 1101, subdivision (b) and 352 under the abuse of discretion standard. (*People v. Kipp* (1998) 18 Cal.4th 349, 369 [Evid. Code, § 1101]; *People v. Rodrigues* (1994) 8 Cal.4th 1060, 1124 [Evid. Code, § 352].) The trial court's decision should not be disturbed on appeal unless the trial court acted in an arbitrary, capricious, or patently absurd manner that resulted in a manifest miscarriage of justice. (*Rodrigues*, at pp. 1124-1125.)

One Facebook posting was a picture of defendant holding a handgun with a caption stating the photo was taken two years ago and that he had missed the signs of cancer then. The caption also stated: "Most professions have some product or service that benefits mankind, or businesses. EXCEPT for insurance adjusters they exist to screw people for a living. Kinda like a mosquito they have zero benefit to mankind. Stay away from Liberty Mutual they will take your money but make you fight your policy coverages regardless of your health."

Other pages show eight firearms on a bench, a closeup of the interior of three bullets, with a statement from defendant, "Making surgeons work for their money. Wasn't to impressed at the range. Going back to talons," a photo of what appears to be a school building and the caption, "2 killed at Central Michigan University, gunman 'armed and dangerous' still at large," a reference to machining AR-10 and AR-15 bodies for the military, and what appears to be defendant's home page, showing his photo with a background photo of firearms on a table next to a coffee mug.

As previously discussed, defendant's Facebook postings were relevant to prove that his threats were credible, an element of the stalking charges, and that the victims sustained fear, an element of the criminal threats counts. The posting with him holding a firearm and the caption critical of Liberty Mutual and insurance adjusters was also relevant as context for determining whether his e-mails contained threats of death or great

bodily injury.  Since the evidence was relevant to prove elements of the charged crimes, it was not inadmissible character evidence under Evidence Code section 1101.

Under Evidence Code section 352, "[t]he court in its discretion may exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury."  " ' " 'Evidence is not prejudicial, as that term is used [in the statute], merely because it undermines the opponent's position or shores up that of the proponent.  The ability to do so is what makes evidence relevant.  The code speaks in terms of undue prejudice.  Unless the dangers of undue prejudice, confusion, or time consumption " 'substantially outweigh' " the probative value of relevant evidence, [an Evid. Code] section 352 objection should fail.  [Citation.]  " 'The "prejudice" referred to in Evidence Code section 352 applies to evidence which uniquely tends to evoke an emotional bias against the defendant as an individual and which has very little effect on the issues.  In applying [Evid. Code] section 352, "prejudicial" is not synonymous with "damaging." '  [Citation.]"  [Citation.]  [¶] The prejudice that [Evid. Code] section 352 " 'is designed to avoid is not the prejudice or damage to a defense that naturally flows from relevant, highly probative evidence.' [Citations.]  'Rather, the statute uses the word in its etymological sense of "prejudging" a person or cause on the basis of extraneous factors.' " ' " ' "  (*People v. Bryant, Smith and Wheeler* (2014) 60 Cal.4th 335, 408.)

Defendant was charged with possessing illegal firearms and referred to firearms in his threatening e-mails; the fact that there were firearms in the Facebook photos is not prejudicial to him in light of the firearm evidence admitted to prove the firearm charges.  Defendant claims the evidence was not just prejudicial, but "incendiary" because the postings were made, and the trial conducted within recent memory of the mass shooting in Parkland.  He also argues the postings confused the issue as to what constitutes the

44

charged threats for the criminal threats counts and what was a credible threat for the stalking count.

Neither argument is persuasive. Defendant indirectly brought up the Parkland shooting in his March 2 e-mail to Stephen where he accuses Stephen of lying about the Florida shooting. The prosecutor never referred to the Parkland shooting in closing, and, while Detective Tredinnick testified to searching defendant's social media and finding photos of the Parkland shooting and a shooting in Michigan, the Facebook photos we have seen in the appellate record do not directly refer to that tragedy. Defendant's claim of jury confusion is likewise unfounded as the prosecution argued to the jury that defendant's e-mails formed the basis of the criminal threats and stalking charges. It was not an abuse of discretion to admit the Facebook evidence.

## VIII

### *Insufficient Evidence for Counts Ten and Eleven*

Defendant was charged in counts ten and eleven with violating section 25850, which provides in pertinent part: "A person is guilty of carrying a loaded firearm when the person carries a loaded firearm on the person or in a vehicle while in any public place or on any public street in an incorporated city or in any public place or on any public street in a prohibited area of unincorporated territory." (§ 25850, subd. (a).) These charges were based on the two handguns found in defendant's car, parked in the mall parking lot in Roseville.

The trial court instructed defendant with CALCRIM No. 2530, which informed the jury the elements of section 25850: the defendant carried a loaded firearm in a vehicle, knew he was carrying a firearm, and, "[a]t that time, the defendant was in a public place or on a public street in an incorporated city." The instruction also stated, "Rocklin, California is an incorporated city."

Defendant claims the instruction that Rocklin is an incorporated city impermissibly directed a verdict, and there is insufficient evidence to satisfy the incorporated city requirement. We agree with the second contention.

There was no evidence at trial, whether by testimony, stipulation, or judicial notice that the parking lot where the firearms were found in defendant's truck was in an incorporated city. While the instruction, had it been supported by taking judicial notice or a stipulation, could have provided the necessary proof, the instruction addressed the wrong city, Rocklin, rather than the place where the guns were found, Roseville. There was testimony that deputies followed defendant's truck as it took the Pleasant Grove Boulevard exit in Roseville and that it parked at the Nugget Plaza shopping Center in Roseville, but there was no evidence this location was in an incorporated city.

The Attorney General asks us to take judicial notice that Roseville is an incorporated city. We decline the request as we, as an appellate court, are prohibited from taking judicial notice of an element not proved at trial.

While we may generally take judicial notice "that a particular location is not within the limits of any incorporated city" (*People v. Armas* (2011) 191 Cal.App.4th 1173, 1187), as a panel of this court stated in *People v. Tomasovich* (1922) 56 Cal.App. 520, where the status of the location in question is an element of the crime charged against the defendant, "it is extremely doubtful whether the courts may take judicial notice of the fact that any particular place or locality is not within the limits of an incorporated city." (*Id*. at p. 533.) We did not decide the question, however, instead concluding that even if the trial court "erred in taking judicial notice of the fact that the place where [the defendant sold liquor] was not within the limits of an incorporated city, and so instructing the jury," the presumed error was harmless because there was uncontradicted evidence presented at trial establishing the defendant sold the liquor outside city limits. (*Ibid*.)

This case does not involve whether the trial court taking judicial notice of a location that supplied an element of a charged crime was harmless, but whether an appellate court can supply a missing element through judicial notice. A decision by the California Supreme Court precludes us from doing so.

In *People v. Davis* (2013) 57 Cal.4th 353 (*Davis*), the defendant was convicted of possession of a controlled substance based on evidence he possessed MDMA, i.e., Ecstasy. However, because neither "MDMA" nor "Ecstasy" are listed in the Health and Safety Code as controlled substances, the prosecution was required to prove the substance "(1) contains any quantity of a controlled substance such as amphetamine, methamphetamine, or MDA, or (2) meets the definition of an analog." (*Davis,* at pp. 358-359.) Despite the fact no such evidence was introduced at trial, the Court of Appeal "took judicial notice of several learned treatises" and concluded the substance contains methamphetamine and amphetamine. (*Id.* at p. 359.) Our Supreme Court reversed, explaining: "While the Court of Appeal, having referred to outside sources, satisfied itself that the pills in question qualified as a controlled substance, those sources were not before the jury. [Citation.] All the jury had before it was a chemical name not listed in any schedule of the code. An appellate court cannot take judicial notice of additional facts the prosecution failed to prove at trial to affirm a conviction. [Citations.] The critical inquiry is whether 'the record evidence could reasonably support a finding of guilt beyond a reasonable doubt.' [Citation.]" (*Id.* at p. 360.)

Here, as in *Davis*, evidence proving an element of the crime was not established at trial. We may not take judicial notice of facts necessary to prove this element in order to affirm defendant's conviction. Defendant's convictions in counts ten and eleven are reversed for insufficient evidence. In light of this holding, we decline to address defendant's contention regarding a directed verdict.

47

## IX

### *Failure to Instruct on Section 30680*

Defendant was convicted in counts thirty and thirty-two of violating section 30605, possession of an assault weapon. The weapons in question were an AK-47 Centerfire Inter Ordnance rifle (count thirty) and an AR-10 Centerfire Aero Precision rifle (count thirty-two).

Section 30605 makes it a crime to possess an assault weapon.

"Section 30605 does not apply to the possession of an assault weapon by a person who has possessed the assault weapon prior to January 1, 2017, if all of the following are applicable:

"(a) Prior to January 1, 2017, the person was eligible to register that assault weapon pursuant to subdivision (b) of Section 30900.

"(b) The person lawfully possessed that assault weapon prior to January 1, 2017.

"(c) The person registers the assault weapon by July 1, 2018, in accordance with subdivision (b) of Section 30900." (§ 30680.)

There was evidence at trial that both weapons were registered to defendant.

Defendant contends the trial court prejudicially erred in failing to instruct the jury on a defense under section 30680. The defense never requested such an instruction.

A court has a duty to instruct sua sponte on a defense only if there is substantial evidence to support it and the defense is not inconsistent with the defendant's theory of the case. (*People v. Lawson* (2013) 215 Cal.App.4th 108, 119.) However, substantial evidence does not mean " ' " 'whenever *any* evidence is presented, no matter how weak.' " ' [Citations.]" (*People v. Wilson* (2005) 36 Cal.4th 309, 331.) It must be evidence that a reasonable jury could find persuasive. (*People v. Ross* (2007) 155 Cal.App.4th 1033, 1049-1050.)

While there was evidence the firearms were registered to defendant, there is no evidence when they were registered to him or when he lawfully possessed them. Since

48

the defense applies, if at all, only to firearms lawfully possessed before January 1, 2017, there is insufficient evidence to support a defense based on section 30680. The trial court had no duty to instruct on this provision.

X

*Sufficiency of the Evidence (Count Thirty-one)*

Defendant contends there is insufficient evidence to support his conviction for possession of an assault weapon in count thirty-one, for possessing the AR-15 Centerline Black Rain Ordnance rifle found in the box on the property where defendant was renting his residence.

The elements of possession of an assault rifle under section 30605 are that the defendant possessed the assault rifle, knew he possessed it, and reasonably should have known the weapon had the characteristics that made it an assault rifle. (CALCRIM No. 2560.) Defendant claims there is insufficient evidence he possessed the rifle in question.

"A defendant possesses a weapon when it is under his dominion and control. [Citation.] A defendant has actual possession when the weapon is in his immediate possession or control. He has constructive possession when the weapon, while not in his actual possession, is nonetheless under his dominion and control, either directly or through others. [Citations.]" (*People v. Peña* (1999) 74 Cal.App.4th 1078, 1083-1084.) "Possession may be imputed when the [weapon] is found in a place which is immediately accessible to the joint dominion and control of the accused and another. [Citation.]" (*People v. Miranda* (2011) 192 Cal.App.4th 398, 410.)

Constructive possession can be established by circumstantial evidence and reasonable inferences drawn from the defendant's conduct. (*People v. Williams* (1971) 5 Cal.3d 211, 215.) The inference of dominion and control is easily made when the contraband is discovered in a place over which the defendant has general dominion and control. (*Ibid.* [single pill on floor in front of seat where the defendant was sitting]; *People v. Miranda, supra*, 192 Cal.App.4th at pp. 410-411 [circumstantial evidence

49

shotgun jointly possessed by car occupants].)  This includes his residence.  (See, e.g., *People v. Bagley* (1955) 133 Cal.App.2d 481, 484-485.)

The firearm here was not registered.  It was found during a warranted search of the area outside defendant's residence on April 15.  This rifle and two other rifles were found in one of the two metal boxes the property's owner, Hall, pointed out to the deputies.  The boxes were spray painted with the logo "FamCo," which is the name of defendant's company.  The locks on the boxes were not in working condition.  Neither the boxes nor the firearms were checked for fingerprints.

Defendant claims there is insufficient evidence the rifle was immediately and exclusively available to him or that he could exercise knowing dominion and control over it.  He notes that he was in custody following his March 26 arrest, over two weeks before the rifle was found.  Defendant asserts the location of the box containing the rifle was not conducive to his exercising dominion and control, as the two boxes were outside his residence and were pointed out by his landlord.  He additionally points out the boxes were not secure and were opened simply by lifting the lids.

Defendant testified to owning both metal boxes and ownership of the two other rifles in the box that were registered to him.  He also testified that he did not recognize the AR-15 at issue here and had not seen the boxes since February, when they were locked.  The rifle was therefore in a box owned by defendant.  Defendant's March 22 e-mail stated he had replanted all his weapons, supporting the inference that all three rifles found in the box were defendant's.  Detective Gualco also testified that the AR-15 found in the box appeared to be the same rifle defendant was seen holding in a January 2015 Facebook photo, as the words "Zombie Hunter" could be seen on both rifles.  From this, the jury could reasonably conclude the AR-15 belonged to defendant and he exercised the right to control it.  Substantial evidence supports the conviction.

50

*Sufficiency of the Evidence:  Unlawful Firearm Activity (Counts Thirty-three-Thirty-five)*

Defendant was convicted of three counts of unlawful firearm activity in violation of a restraining order (§ 29825, subd. (b)) in counts thirty-three through thirty-five, based on the three firearms found in the metal box on April 15.  According to defendant, the conviction cannot stand because the temporary restraining order against him had expired on March 26, before the deputies found the weapons during the April 15 search.  (See *Granny Goose Foods, Inc. v. Brotherhood of Teamsters* (1974) 415 U.S. 423, 431-432 [39 L.Ed.2d 435, 446-448] [temporary restraining order issued by California court dissolves and is without effect if not renewed before expiration].)

As discussed, *ante*, in part X, defendant was in constructive possession of those weapons when they were found in the metal box, as he was incarcerated at the time.  In addition to the unregistered AR-15, which we have found that defendant possessed, the other two rifles in the box were registered to him, and therefore also his.  The March 22 e-mail in which he claims to have "replanted" his weapons supports the inference that he had the rifles at that time and hid them in the box because of the restraining order.  The restraining order required defendant to sell or store his firearms with a licensed dealer or turn them in to a law enforcement agency within 24 hours of being served with the order.  Defendant was aware of the temporary restraining order, had been personally served with the order, referenced it in an e-mail, and admitted to law enforcement that he had been served.

The jury could reasonably infer that defendant was aware of the order and, having dominion and control over the three rifles, hid them in the metal box on March 22 when he sent the e-mail to Stephen.  Defendant's claim of insufficient evidence is without merit.

## XII

*Sufficiency of the Evidence: Possession of Ammunition in Violation of a Court Order*

Defendant contends there is insufficient evidence to support his conviction for section 30305, possession of ammunition in violation of a court order, in count thirty-six. Like the previous contention, this one is based on the fact that the ammunition for this count was found during the April 15 search, after the temporary restraining order expired. Just as there is evidence of the jury to conclude the three rifles found on April 15 were possessed when the restraining order was in effect, the same evidence also supports finding that defendant possessed the ammunition then as well. Although defendant's March 22 e-mail referred only to him replanting his guns, it can reasonably be inferred that the ammunition was possessed simultaneously with defendant's firearms. Substantial evidence supports the conviction.

## XIII

*Counts Fifteen and Thirty-seven Must be Vacated*

Defendant contends, and the Attorney General concedes, that his convictions for disobeying a court order (§ 273.6) in counts fifteen and thirty-seven must be vacated. We agree.

Defendant was convicted in count fifteen for disobeying the temporary restraining order issued under Code of Civil Procedure section 527.8 based on his possessing ammunition on or about March 26, and in count thirty-seven for possessing ammunition in violation of the order between March 26 and April 15. Section 273.6, as pertinent here, makes it a misdemeanor to intentionally and knowingly violate an order issued pursuant to Code of Civil Procedure section 527.8. (§ 273.6, subd. (a).)

A person subject to a Code of Civil Procedure section 527.8 order "shall not own, possess, purchase, receive, or attempt to purchase or receive a firearm or ammunition while the protective order is in effect." (Code Civ. Proc., § 527.8, subd. (s)(1).) The statute also provides: "Every person who owns, possesses, purchases or receives, or

52

attempts to purchase or receive a firearm or ammunition while the protective order is in effect is punishable pursuant to Section 29825 of the Penal Code." (Code Civ. Proc., § 527.8, subd. (s)(3).) Defendant was convicted under sections 29825 and 30305 for possessing ammunition in violation of the temporary restraining order in count twenty-seven based on the March 26 possession of ammunition, and in count thirty-six based on possessing the ammunition between March 26 and April 15.

The convictions in counts fifteen and thirty-seven were not authorized by statute; the underlying conduct was prosecuted under the correct statute in different counts. Therefore, the convictions in counts fifteen and thirty-seven shall be vacated.

XIV

*Sufficiency of the Evidence:  Possession of Burglary Tools*

Defendant asserts there is insufficient evidence to sustain his conviction for possession of burglary tools. (§ 466.)

To convict defendant on this charge, the People were required to establish: "(1) possession by the defendant; (2) of tools within the purview of the statute; (3) with the intent to use the tools for the felonious purpose of breaking or entering. [Citation.]" (*People v. Southard* (2007) 152 Cal.App.4th 1079, 1084-1085; § 466.)

The backpack in defendant's truck contained a "Pro-Lock" lock pick set in a leather pouch. Defendant testified that the lock pick set was used for his alarm business, to allow him to access locked boxes on site with the owner's permission. According to defendant, there was no evidence he intended to use the pick set to feloniously break into a building or other structure, so the conviction cannot stand.

Intent is " 'rarely susceptible of direct proof' " and instead " 'must usually be inferred from all the facts and circumstances disclosed by the evidence.' [Citations.]" (*People v. Falck* (1997) 52 Cal.App.4th 287, 299.) In his initial call to Deborah, defendant angrily told her he was going to the Rocklin office and that he had guns. Defendant subsequently e-mailed all three victims, "I'm not asking permission to go into

your workspace, corporate security please?! lol. I know all these buildings!!!  Give two fucks about security, or the police!"

Defendant argues the statement in the e-mail must be read in the context of defendant's previous efforts to arrange a face-to-face meeting with Liberty Mutual employees.  Defendant's argument overlooks the fact that defendant threatened to enter the office without permission and would not be deterred by corporate security.  It also ignores our standard of review for substantial evidence claims, where we make every reasonable inference in support of the guilty verdict.  The e-mail shows defendant's intent to enter the Rocklin office notwithstanding any corporate security efforts.  The jury could reasonably infer the lock pick was with the intent to feloniously enter the Rocklin office.  Substantial evidence supports the conviction.

XV

*Section 654*

Defendant contends sentences on attempted criminal threats (count one) criminal threats (counts two to five) and carrying a concealed firearm (counts twelve & thirteen) should be stayed pursuant to section 654.  The Attorney General agrees with defendant on counts two, three, twelve, and thirteen, and asserts sentence should also be stayed under section 654 for unlawful firearm activity (§ 29825) in counts sixteen and thirty-three through thirty-five.

The trial court sentenced defendant as follows:  an upper term of four years for stalking in count six, the principal term, consecutive terms of eight months for counts eight and nine (stalking), ten and eleven (carrying a loaded firearm in a vehicle), twenty-seven (possession of ammunition in violation of a court order), thirty through thirty-two (possession of an assault rifle), and thirty-six (possession of ammunition in violation of a court order).  The court imposed concurrent terms for counts one through five (criminal threats and attempted criminal threats), along with twelve and thirteen (possession of a concealed weapon in a vehicle), while staying pursuant to section 654 the sentence for

count seven (stalking). The remaining misdemeanor counts, fourteen through twenty-six, twenty-eight, twenty-nine, thirty-three through thirty-five, and thirty-seven, were all given concurrent 364-day terms.

" ' "[S]ection 654 of the Penal Code proscribes multiple punishment for a single 'act or omission which is made punishable' by different statutes, i.e., a single *criminal* act or omission." ' [Citations.] This prohibition against multiple punishment applies to a juvenile court's aggregation of periods of confinement on multiple counts. [Citations.] [¶] ' "[I]t is well settled that . . . section 654 applies not only where there was but one act in the ordinary sense, but also where there was a course of conduct which violated more than one statute but nevertheless constituted an indivisible transaction. . . . If all the offenses were incident to one objective, the defendant may be punished for any one of such offenses but not for more than one." ' [Citations.]" (*In re Calvin S.* (2016) 5 Cal.App.5th 522, 533.) We review a lower court's factual finding whether there was a single criminal act under the substantial evidence standard, which will not be reversed unless unsupported by the evidence. (*People v. Saffle* (1992) 4 Cal.App.4th 434, 438.)

Counts one through three were based on the e-mails sent to Stephen on February 28, March 2, and March 22. These e-mails were part of the course of conduct underlying the stalking charges in counts six and seven. Counts four and five were based on the March 5 e-mail sent to Amber and Deborah, which was part of the course of conduct underlying the stalking charges in counts eight and nine. The Attorney General argues counts four and five should not be stayed because the March 5 e-mail was sent several days after the other harassing e-mails to Amber and Deborah, thus giving defendant time to reflect and form a separate intent. We disagree. The March 5 e-mail was part of the same course of conduct and with the same overall plan as the other communications underlying the stalking charges in counts six and seven. Counts two through five are to be stayed pursuant to section 654. The claim as to count one, attempted criminal threats, is moot since we reverse that count for instructional error.

Defendant next contends the convictions for violating section 25400 (counts twelve & thirteen) should be stayed because they involved unlawful possession of the same firearms underlying convictions for violating section 25850 in counts ten and eleven. Our reversal of counts ten and eleven for insufficient evidence moots this claim. However, as the Attorney General points out, defendant was sentenced to concurrent terms in counts sixteen and seventeen even though those were based on possession of the same firearms that respectively formed the basis for his convictions in counts twelve and thirteen. We agree. Where multiple convictions were based on a single act, a defendant can be punished only once for the act; the remaining counts must be stayed pursuant to section 654. (*People v. Corpening* (2016) 2 Cal.5th 307, 316.) We shall stay counts sixteen and seventeen pursuant to section 654.

We likewise agree with the Attorney General that sentence on the convictions for unlawful firearm activity in counts thirty-three through thirty-five should be stayed. Those counts were based on defendant's possession of the three assault weapons found in the metal box during the April 15 search. Those same weapons formed the basis of the convictions for possession of an assault weapon in counts thirty through thirty-two. Since defendant can be punished only once for the single act of unlawfully possessing a firearm, sentence for counts thirty-three through thirty-five shall be stayed pursuant to section 654.

## DISPOSITION

The conviction in count one is reversed for instructional error and remanded.  The convictions in counts ten and eleven are reversed for insufficient evidence, and the convictions in counts seven, fifteen, and thirty-seven are vacated.  Sentence on counts two through five, sixteen, seventeen, and thirty-three through thirty-five are stayed pursuant to section 654.  The judgment is affirmed in all other respects.


_____/s/_____
BLEASE, Acting P. J.


We concur:


_____/s/_____
MAURO, J.


_____/s/_____
HOCH, J.